William L. SWANSON, Respondent,

v.

Howard GODWIN, also known as Howard S. Godwin, and Charlotte C. Baer, also known as Charlotte C. Godwin, Trustee, Appellants.

No. 47012.

Supreme Court of Missouri,
Division No. 2.

Sept. 14, 1959.

Motion for Rehearing or to Transfer to Court en Banc Denied Oct. 12, 1959.

Schwartz & James, Harry M. James, St. Louis, Dalton W. Schreiber, Clayton, for appellants, Joseph Nessenfeld, St. Louis, of counsel.

Husch, Eppenberger, Donohue, Elson & Jones, Rexford H. Caruthers, Martin Schiff, Jr., St. Louis, William J. Oetting, Clayton, for respondent.

EAGER, Judge.

Plaintiff was seriously injured on May 14, 1957, when he fell over a drop off of approximately six feet between two private parking lots, at night, in Clayton, St. Louis County. The defendants were the operator and the owner of the building and the parking lot from which he fell. No point is made here regarding any severable liability of the defendants. Plaintiff's theory of negligence was that the lot was inadequately lighted and that defendants had undertaken to light it. Verdict was returned and judgment entered for plaintiff in the

sum of $21,000. There is no complaint here of the amount of the verdict. After unsuccessful motions for judgment and for a new trial, defendants have appealed.

The parking lot in question was in the rear of the Godwin Building at 7908 Bonhomme in Clayton. This was a small office building, facing north, which had been converted from a four-family apartment building about 1947. At that time the rear yard was converted into a parking lot for tenants, being covered with rock and later with asphalt. Seven or eight open spaces were marked off for tenants in the north half of the lot, and a narrow five-stall garage extended south therefrom along the west side to the alley in the rear (south). To the east of the garage there was a common driveway for entrance. The open parking spaces were thus north of the garage. The one with which we are concerned was immediately north of the garage, facing west; however, a brick incinerator had been built against the north end of the garage and very little space remained between it and the left (south) side of the parking space. This space and another were assigned to a Mr. Mertz, a landscape architect, who will be mentioned later.

In 1954 the Guild Building was constructed immediately west of the Godwin Building, with a larger parking lot in the rear. The excavation made therefor resulted in a drop off of at least six feet from the Godwin lot to the Guild lot; previously the drop off had been nominal. A retaining wall was built on the property line, extending about ten inches above the level of the Godwin lot at the point in question. Cars were regularly parked along the west side of the Godwin lot up against this wall or curb, at an angle, and the spaces were so marked with yellow lines. The distance from the Godwin Building to the north (nearest) end of the garage was 56 feet, and the garage extended another 48 feet to the alley.

While the Godwin Building was used for apartments a "shallow dome-shaped light fixture" (defendant's brief, p. 4) was in use on the southwest corner (rear), about 13–15 feet above the ground. This and other "common" lights of the building were on an electric timing device. There was a back stairway (apparently inside) and an entrance to the basement area, under or near this light which were used by the janitor and by tenants. When the building was converted no change was made in this outside light fixture, the type of bulb, or its method of use. Defendants bought 40 and 60 watt bulbs for use in that and other fixtures and the janitor replaced with these all burned out bulbs, including the ones in that fixture. Defendants did not know whether the bulb was a 40 or 60 watt at the time of the fall. Common lights were provided in the halls and in front of the building, though none of these shone out on the parking lot. The electric timing device turned on all common lights (including the outside light described) shortly before sunset and off at about midnight. The rear light described cast a faint light on some or all the parking area. Defendant Godwin testified: that this light was never intended to light the parking area, and that it was merely left there upon the conversion of the building; also that the janitor "probably gets the most use out of it"; that this light "happens to cast" some light on the parking lot, and that, of course, he knew this; also, that they continued to replace the bulbs in it when they burned out, but that they never increased the bulb size or changed the fixture. Mr. Godwin also testified that with the light thus available and upon experiment before trial, he had no difficulty in seeing his own car parked at night in the Swanson stall (next to the garage), the curbing or wall, and his own shadow; and that the light "should be" (i. e. presumably was) either a 40 or 60 watt bulb. Plaintiff's lighting engineer testified as an expert that the bulb in question was either a 25 or a 40 watt bulb, and that the degree of light at the place in question was "negligible," stating also that for practical purposes there was no illumi-

nation at the end of the parking area; he also stated as his opinion that there should have been three 300 watt bulbs distributed along the wall. Mr. Godwin also testified: that he would not expect the parking lot to be used at night, although one tenant often worked until midnight; that the building entrances were never locked; that the parking lot was helpful in renting the offices. A janitor was on duty at the building three nights a week and he regularly checked all the common lights. The bulb in question was burning on the day after plaintiff's accident, without change or alteration.

William B. Swanson, the son of plaintiff, whom we shall call "Bill" Swanson to distinguish him from his father William L., was a landscape architect employed since February 1956 by Mr. Stuart Mertz, one of defendants' first office tenants; these offices were on the first floor. The parking space here in question (next to the garage) had been "given" to Bill Swanson, and was used by him; the rental of this and another stall was paid by Mr. Mertz and computed as part of his lease rental. Bill Swanson, his wife and baby, lived in the north part of St. Louis County and he drove his 1953 Chevrolet to work regularly. His ordinary quitting time was around 5 o'clock, but he had frequently worked at night and used the parking space, and he had observed that other tenants did likewise. He testified that he had some business of his own upon which he sometimes worked. At the time here in question his father and mother were visiting him and his family, having arrived just a few days previously. The father was a "roller" in a mill of the U. S. Steel Company at Homestead, Pa. On an earlier visit his father had been in the office but he had entered by the front entrance and had not seen the parking lot. On the day of the injury plaintiff, his wife, and Bill's wife and baby had driven into the parking lot in daylight in plaintiff's Oldsmobile about 5:30 p. m. to pick Bill up; Bill's wife was driving and she turned the car toward the west side of the lot and

stopped. She "honked" for Bill, he looked out the window, and came down almost immediately. Plaintiff's testimony was that during this very short time he was in the back seat playing with the baby, and that he observed nothing of the surroundings. When the son came out he got into the Olds and drove it, leaving his car on the lot; they took Bill's wife to a meeting, picked her up a little later, and had dinner at a restaurant; they bought some odds and ends of lumber which they put in the trunk (sticking out a foot or two), and then decided to return to the parking lot to pick up Bill's car so that both cars would not be on the lot the next day. On arriving there about 10:00 p. m., Bill backed the Olds into the lot from the alley, leaving the front end about even with the north end of the garage; he got out and looked at the lumber, first intending to drive the Chevrolet home; in fact plaintiff had moved over into the driver's seat of the Olds. Bill then decided that it would be better for his father to drive the Chevrolet and follow him, watching the lumber, with Bill's wife going along; he so informed plaintiff and gave him his keys; plaintiff acceded, he and the daughter-in-law got out of the Olds, and Bill got in and closed the door. Plaintiff walked around the Olds (at the rear as he recalls), and walked to the Chevrolet; as he did so, Bill let the Olds coast forward a few feet. Plaintiff testified: that as he walked thus to the Chevrolet the visibility was "very poor," that he didn't see any lights, that it was "very dark and hard to see"; that the Chevrolet was not "very visible," that he could "see it," and that was all; that he walked along the right side of the Chevrolet to go around it and get to the driver's side; when he got to the front of it he put his hand on the fender to keep from turning too soon, but after he made the turn he didn't "remember much after that." It is uncontradicted that he fell to the adjoining lot suffering very serious injuries. Bill, of course, got out and rushed over when his wife screamed, and he succeeded in getting his father to a hos-

pital. He testified that it was very dark on the lot, that he could not see the retaining wall until he got very close to it, but that he could then, knowing what to look for. Marilyn Swanson, the daughter-in-law, was walking a little behind plaintiff. She testified: that it was "quite dark"; that "you could see the car being a big object," but that she did not recall seeing anything else; that plaintiff was walking along the side of the Chevrolet in a natural stride; that he walked past the front of it, and "just went over." A diagram and photographs in evidence indicate that, when so parked within the painted parking lines, the right front of the Chevrolet would be probably a foot or more back from the wall, while the left front would be against it or would overlap it. Such other facts as are necessary will be referred to later in the opinion.

Defendants' points here are: that a verdict should have been directed for them because (a) plaintiff was a mere licensee; (b) defendants had never undertaken to light the parking lot, and were under no duty to do so; (c) there was no proof of causal connection; and (d) that plaintiff was contributorily negligent as a matter of law; also that there was error in the giving of two instructions.

■ On the invitee-licensee contention defendants say: that plaintiff was merely on the premises as a guest of his son, who was an employee of a tenant, after business hours, and for the personal convenience of the son; that this was in no way incidental to any business of a tenant nor was such a use fairly within the contemplation of defendants in furnishing the lot for business purposes. It is more or less conceded that tenants must have visitors and guests, even those not strictly on the tenant's business, such as solicitors, voluntary salesmen, social guests, etc., who are invitees; it is insisted, however, that this after-hours use of the lot by one so far removed from a tenant was wholly "uninvited," if not unauthorized. We believe

that this construction is too narrow. Bill Swanson was a professional man, and an essential employee; for all practical purposes, a parking space was assigned to him for his regular use. The building was open regularly at night and tenants used it at night; common lights were operated for that purpose until midnight. Where a parking lot is furnished, its use becomes an integral part of the building-use, and this need is vital in congested areas such as this one. It should reasonably be contemplated that a tenant would use the lot at night for any convenient and legitimate purposes; and certainly such purposes might comprehend staying down town for dinner or shopping, leaving a car on the lot, and removing (or exchanging, as here) the car when the mission was completed. This, in effect, would merely be a delayed departure from work. While Bill Swanson was not a formal tenant, he closely approached or attained that status in fact, in so far as the parking lot was concerned. Defendants specifically authorized or acquiesced in the regular use of a parking space by Bill Swanson. Mr. Mertz paid for it as part of his lease rental. There is no showing that this lot was used by business customers of tenants, although such is not highly material. We hold that the invitation to use the lot did, within a fair contemplation, include this use by the immediate family of Bill Swanson there on a legitimate mission. Plaintiff was not there from mere curiosity or as a casual visitor, but actually on his son's mission, and, we might say, aiding his delayed departure from work. There was nothing which required Bill to get off the premises at 5:30. The lot, the assigned parking space, the open, lighted building (all without reservation or limitation) furnished a sufficient "invitation," which term "includes in it enticement, allurement, and inducement * * *." Glaser v. Rothschild, 221 Mo. 180, 120 S.W. 1, 3, 22 L.R.A.,N.S., 1045; Gilliland v. Bondurant, 332 Mo. 881, 59 S.W.2d 679, 686, 687. It is too narrow a view to hold that the use of the lot was confined to business hours and to tenants

and their employees there on strictly business missions.

It is said that the distinction between an invitee and a licensee rests primarily in the nature of one's business on the premises. Connole v. Floyd Plant Food Co., Mo.App., 96 S.W.2d 655; Forsythe v. Shryack-Thom Grocery Co., 283 Mo. 49, 223 S.W. 39, 10 A.L.R. 711; Stevenson v. Kansas City Southern R. Co., 348 Mo. 1216, 159 S.W.2d 260. These cases and the others cited by defendants are, in our opinion, distinguishable. Here a reasonable use of the lot by the tenants and by one in Bill Swanson's position, was invited as an integral part of the promotion of the office building; and this invitation, by a fair interpretation and contemplation, extended to members of their families who might come there in order to assist their ordinary and legitimate movements. It is impossible to discuss the multitude of individual cases cited here, pro and con. It may be that in applying the status of invitee to Bill Swanson's father we·are extending the usual rule which has fixed a duty on the part of ˙the owner to the invitees or employees of a tenant. Darlington v. Railway Exchange Bldg., 353 Mo. 569, 183 S.W.2d 101; Reinagel v. Walnuts Residence Co., 239 Mo.App. 701, 194 S.W.2d 229. We doubt this, for here Bill Swanson occupied a status substantially equivalent to that of a tenant. Regardless of that precise question, however, the visit was one reasonably to be anticipated as incidental to the˙ owner's business operation and purposes, and we think that is sufficient under the circumstances.

■ Defendants concede that they would owe to invitees the duty to exercise reasonable care in providing adequate light in the parking lot, if, and only if, they had undertaken to light it. They say that under these circumstances they had not undertaken to light it. The expressed intention of defendants is not conclusive, at least in the absence of notice; if intention be material, the jury could decide the real intention and its scope. Defendants cite one case on the question of intention and we do not find it in point. Huffman v. Home Owners' Loan Corp., D.C., 55 F.Supp. 453, affirmed, 8 Cir., 150 F.2d 162, certiorari denied 326 U.S. 758, 66 S.Ct. 100, 90 L.Ed. 455; as we read it, it indicates that to "undertake" means actually to "enter upon" an endeavor. This question was submitted to the jury and its finding is conclusive if there was substantial evidence. The acts of defendants since the conversion of the building, and not a subjective intention, must control. Defendants left the light in position to throw some faint rays on areas of the parking lot; defendant Godwin testified that he had no difficulty in moving about the lot in its rays, and in seeing all objects. The janitor regularly checked this and other lights and replaced burned out bulbs over the years; the light was kept burning until midnight and then turned off by means of the automatic timing device, along with all other common lights; the purpose of the light after the conversion of the building could not have been precisely the same as before, for the business tenants did not, presumably, need access to the basement. We hold that defendants, by their acts for approximately ten years, undertook to light the parking lot and that they thereby assumed the duty to exercise reasonable care in furnishing adequate light. The contention that this duty would not extend to the parking spaces of Mertz (and specifically Bill Swanson's) because they were not "common areas," does not merit serious consideration. Apparently, an analogy to apartment buildings is sought to be laid. There is no analogy, for while a tenant is required to light his own apartment, as distinguished from common hallways and stairs, it would be little short of ridiculous to hold that each occupant or tenant of a stall in a parking lot must light his own space. On defendants' argument no one would be required to furnish any light to the individual stalls, even though a general duty to light had been assumed. And, of course, the common areas immediately

adjoining the space must be used to enter it. There can be no such arbitrary division or separation of the integral parts of a parking lot. Having thus undertaken to light the lot defendants were required to exercise reasonable care to provide adequate lighting. Reinagel v. Walnuts Residence Co., 239 Mo.App. 701, 194 S.W.2d 229, 231; Lambert v. Jones, 339 Mo. 677, 98 S.W.2d 752, 756; Ullrich v. Kintzele, Mo.App., 297 S.W.2d 602. Defendants also assert that plaintiff, as a stranger, did not know of any undertaking to light the lot, did not rely upon it, and that he can now assert no breach of duty; that reliance upon the assumption is an essential element because, after notice, the landlord may "cast off" the assumed duty; and that plaintiff was in no better position than one to whom such a notice had been given. We are not sure that we fully understand this argument. True, plaintiff had never been there at night, and he did not testify that he saw and relied upon the light; he stated somewhat generally that he noticed no lights. The fact remains, however, that the light was there, though faint, and he must have been vaguely conscious of it for he saw the Chevrolet dimly. We do not think it was necessary for plaintiff's mind and senses to go through the precise process of seeing the light and of analyzing its purpose. There was no attempt here to "cast off" any duty to any one, if that be material. If any type of reliance was material here, there is a fair inference from the evidence that plaintiff relied upon the existence of a condition of reasonable safety in the premises provided. In the following cases plaintiffs (business invitees, guests of tenants, employees) were permitted to recover, though proceeding in obvious darkness, total or partial, on premises where the landlord or owner had assumed a duty of lighting. Dean v. Safeway Stores, Inc., Mo., 300 S.W.2d 431; Winters v. Hassenbusch, Mo.App., 89 S. W.2d 546; Gentili v. Dimaria, Mo.App., 89 S.W.2d 93; Eaton v. Wallace, Mo., 287 S.W. 614, 48 A.L.R. 1291. The facts in those cases indicate that those plaintiffs could not well have relied presently upon the existence of a duty to light, for the usual lights were not burning. In the Eaton case a similar contention was considered as a question of contributory negligence. The contention of nonreliance is denied.

Defendants also say that no causal connection was sufficiently proven; in other words, that there was no substantial evidence that inadequate light caused plaintiff to fall over the wall, and that the verdict rests upon speculation. They suggest, for instance, that plaintiff may have merely lost his balance, or blacked out, or become dizzy. It would require a greater degree of speculation to infer any of those conclusions than it would to infer that the darkness was the cause. No prior ill health of plaintiff was even intimated in the evidence. Defendants say further that plaintiff did not testify specifically that he did not see the wall, or that he could not see it; and that, if he could have seen or did see the wall, the degree of light was immaterial, for he then had notice of its presence. Plaintiff testified that he did not remember much after he turned in front of the car. It is entirely conceivable that his serious injuries affected his memory of all further details. Regardless of this, however, and allowing to plaintiff the benefit of all reasonable inferences from his testimony, we have no doubt that a jury issue was made. Here plaintiff, a stranger, tried to walk in front of the car parked at an angle as required; there was a condition of almost total darkness; the wall projected up for a distance (10 inches) likely to trip one who did not see it; the car was parked at such an angle to the wall as to permit plaintiff to get in front of the car at its right corner, but to stop him as he proceeded, unless he knew of the wall and stepped upon it. Under these circumstances the submitted issue of causation (inadequate lighting) was justified not only by a permissible inference, but in our opin-

ion by the most logical inference. It is immaterial that those who knew of the wall and were looking for it could see it by looking when they got very close to it. The "conjecture" cases cited are inapplicable here. Plaintiff's evidence need not exclude all those causes for which defendants would not be liable. Whitaker v. Terminal R. Ass'n, Mo.App., 224 S.W.2d 606, 611; Van Brock v. First National Bank in St. Louis, 349 Mo. 425, 161 S.W.2d 258; Cech v. Mallinckrodt Chemical Co., 323 Mo. 601, 20 S.W.2d 509, 515. It is sufficient if there is substantial evidence from which the jury may find that negligence was the proximate cause. Anything beyond that is a matter of defense. And causal connection may be, and often is, proved by showing facts and circumstances which "fairly suggest" negligence as the proximate cause, in the light of ordinary experience. Anderson v. Asphalt Distributing Co., Mo., 55 S.W.2d 688, 693, 86 A.L.R. 1033; Long v. F. W. Woolworth Co., 232 Mo.App. 417, 109 S.W.2d 85, 88; State ex rel. City of St. Charles v. Haid, Banc, 325 Mo. 107, 28 S.W.2d 97. We deem the evidence and circumstances here sufficient. Certainly some reasonable minds would draw the conclusion that darkness was the cause of the fall, and that plaintiff could not see the wall.

■ Lastly, in support of their claim for a directed verdict, defendants assert contributory negligence as a matter of law. We have reviewed the facts at length and will not repeat them. Defendants argue that plaintiff, being unfamiliar with the parking lot, could and should have: (a) stayed in his car; (b) made inquiry as to the "physical surroundings"; (c) obtained a flashlight or "other light"; or (d) requested his daughter-in-law to "lead the way." Such assertions may have constituted a good argument to a jury on the issue, but certainly all would not agree that plaintiff, as a matter of law, was bound to pursue one of these alternatives. Missouri has held very definitely that one attempting to descend an unlighted stairway or otherwise proceeding in darkness is not necessarily contributorily negligent. Dean, Winters, McFarland and Eaton cases, supra. His acquaintance or unfamiliarity with the premises is a matter affecting the degree of care required. Of course, plaintiff should and must have exercised the care of an ordinarily reasonable and prudent person in proceeding. The jury found that he did, and the contrary is not established as a matter of law. As said in Dean, supra (300 S.W.2d 431, 434): "The fact that Dean had some knowledge of the darkened condition of the premises did not preclude his use of the parking lot entirely. Although he had some knowledge and should have had some apprehension of the hazard, it may not be said, in all the circumstances, that he 'appreciated' the danger. * * * The plaintiff entered the store when it was 'dusky dark' and if he was to return to his automobile it was necessary for him to retrace his steps across the unlighted parking lot; there was no alternative course unless he returned and informed the store that its lights had not been turned on, and certainly reasonable minds could well differ as to the reasonableness of his conduct in the circumstances." Here, though plaintiff knew its was dark, there was ample evidence that he had no knowledge or adequate appreciation of the real hazard. Defendants say that there was no evidence to support a finding that plaintiff exercised due care in proceeding as he did, and no evidence of any reasonable necessity for his action. On the left side of the Chevrolet was the incinerator; it, perhaps, looked more foreboding in the darkness than did the path along the right side and in front of the car. A curb at the edge of a parking lot may be common, but a six foot drop off is not. The question was for the jury. See, generally Dean, supra; Winters v. Hassenbusch, Mo.App., 89 S.W.2d 546 and cases cited; McFarland v. Sears, Roebuck & Co., Mo.App., 91 S.W.2d 615, 620; Gentili v. Dimaria, Mo.App., 89 S.W.2d 93; Eaton v. Wallace, Mo., 287 S.W. 614,

616, 48 A.L.R. 1291. As said in Winters, supra [89 S.W.2d 550]: "In the case at bar plaintiff knew that it was dark where she was using the stairs and, of course, the burden was upon her to use greater caution in descending the stairs than had the stairs been fully lighted. However, we cannot say that plaintiff was guilty of contributory negligence, as a matter of law, because she did not peer through the darkness at each step she took while descending." In order to hold plaintiff guilty of contributory negligence as a matter of law, the evidence considered most favorably to plaintiff must permit of no other conclusion. Thompson v. Byers Transp. Co., 362 Mo. 42, 239 S.W.2d 498, 500; Joshmer v. Fred Weber Contractors, Inc., Mo. App., 294 S.W.2d 576, 585.

■ The last points of defendants concern alleged error in the giving of two instructions. Instruction No. 1 told the jury (in substance) that if the owner and agent of premises undertook and assumed the duty of lighting they were legally bound to perform the duty with reasonable care, and that if defendants here had, as the owner and the operator of the premises, undertaken to provide lighting on the parking lot, then they were required to use reasonable care in so doing, and that "a failure" to do so would constitute negligence. Defendants say that this instruction assumed that the duty would extend to all parts of the lot, including those not used in common, and to all persons, whether invitees or not. We shall not consider again the contention concerning parts of the lot not used in common. As to the "persons," defendants say that the statement that "a failure" to use the required care was negligence permitted a finding of negligence as to any one, regardless of his status. This instruction did not direct a verdict and it must be considered together with the main verdict-directing Instruction No. 3. When so considered, it was not erroneous. Instruction No. 3 was as follows: "If, according to Instruction No. 1, you find that defendant

Charlotte C. Baer, Trustee, and defendant Howard S. Godwin were charged with the duty to use reasonable care and prudence in providing lighting for the parking lot in the rear of the Godwin Building, and if you further find and believe from the evidence that since 1954 there was a retaining wall protruding above the surface of the west edge of said parking lot in the rear of the Godwin Building, and that immediately west of said retaining wall there was a drop of approximately six feet to the surface of another parking lot, and that the said parking lot in the rear of the Godwin Building was made available by defendants for use at night by the tenants of the Godwin Building, and that by reason of the existence of said retaining wall and said drop there existed the probability or likelihood that tenants of the Godwin Building or their invited guests using said parking lot at night might stumble and fall and be injured unless said parking lot was adequately lighted, and that the lighting provided by the defendants for said parking lot was inadequate to permit tenants of the Godwin Building or their invited guests to use said parking lot at night with reasonable safety, and if you further find that by reason of all the aforesaid facts and circumstances the defendants did not use reasonable care and prudence in providing lighting for said parking lot and were negligent, and that the plaintiff was on the parking lot on May 14, 1957 as an invited guest of his son, and that his son was an employee of a tenant of the defendants, and that as a direct and proximate result of the negligence, if any, of the defendants, the plaintiff was caused to stumble over said retaining wall and fall and be injured, then it would be your duty to return a verdict for the plaintiff and against both the defendants." Defendants say that: (a) this instruction assumes that plaintiff was an invitee, both generally and under the particular circumstances; (b) that it fails to require a finding that defendants undertook to light that particular area; (c) that it is vague, indefinite

and misleading in not requiring specifically a finding that the wall "could not be seen or was not seen by plaintiff"; and (d) that proximate cause was insufficiently submitted. As to (b) above, and also a similar argument under (a), we again decline to consider the lot in separate, arbitrary segments, as "common" spaces and otherwise. So far as the undertaking to light was concerned, and the scope of the invitation on these facts, the lot was a unit. The instruction does not assume as a matter of law that plaintiff was an invitee; it requires a finding that the lot "was made available by defendants for use at night by the tenants," and it refers in two places to "their invited guests." This requirement included the basic fact necessary to an "invitation," which the jury thus affirmatively found. The only remaining question was plaintiff's status, and under these facts we have held as a matter of law that he was within the scope of the general invitation. The arguments on (c) and (d), supra, may be considered together. The basic contention here is: that the instruction was defective in not requiring a finding that plaintiff did not see and could not have seen the wall; that this was necessary in order to eliminate the element of knowledge or notice, actual or constructive; that lack of knowledge is an essential element of his case; and also that without such a requirement the submission of proximate cause was misleading. Thereon defendants cite, primarily, two business-invitee cases, Daggs v. Patsos, Mo. App., 260 S.W.2d 794, and Trautloff v. Dannen Mills, Inc., Mo.App., 316 S.W.2d 866. We need not approve or disapprove of those holdings here. We do note that they were questioned in Coplen v. Zimmerman, Mo., 271 S.W.2d 513, 517. And see Edwards v. E. B. Murray & Co., Mo.App., 305 S.W.2d 702, loc. cit. 707. The doctrine arises from the requirement of superior knowledge on the part of the owner and his nonliability on a showing of "obviousness" (Murray v. Ralph D'Oench Co., 347 Mo. 365, 147 S.W.2d 623) in the business-

invitee cases. Defendants strongly assert that the question is not merely one of contributory negligence, as plaintiff insists, but that it is an essential part of plaintiff's case as regards the adequacy or inadequacy of the lighting and the lack of notice. For whatever it may be worth, we note that defendants' Instruction No. 7 submitting contributory negligence contained no requirement of a specific finding that plaintiff did see or could have seen the wall.

■ In the landlord and tenant cases the question of knowledge or lack of knowledge goes merely to the defense of contributory negligence, and lack of knowledge is not an element of plaintiff's case. For full discussions of the distinction and its underlying reasons, see O'Neill v. Sherrill, Mo.App., 254 S.W.2d 263; Roman v. King, 289 Mo. 641, 233 S.W. 161, 25 A.L.R. 1263; Coplen v. Zimmerman, Mo., 271 S.W.2d 513, 517; Edwards v. E. B. Murray & Co., Mo.App., 305 S.W.2d 702. Missouri cases have applied this more liberal landlord and tenant rule in suits for injuries suffered by invitees or employees of tenants on business or commercial premises. O'Neill, Edwards, supra; Bartlett v. Taylor, 351 Mo. 1060, 174 S.W.2d 844; Reinagel v. Walnuts Residence Co., 239 Mo.App. 701, 194 S.W.2d 229, 232 (separate opinion of Cave, J.) And, generally, Darlington v. Railway Exchange Bldg., 353 Mo. 569, 183 S.W.2d 101. We apply that principle here. Knowledge not being an essential element of plaintiff's case, the issue was amply considered and determined by the jury as a matter of contributory negligence. Some of the asserted omissions in this instruction concern matters largely evidentiary, which did not need to be submitted specifically. The jury could not have misunderstood the uncontradicted facts and circumstances regarding the time, the exact location, and the purposes of the visit; nor could the jury have failed, in our opinion, to understand that plaintiff could only recover if his injuries were the direct and proximate result of his stumbling over the

wall because of, and only because of, inadequate lighting. As already stated, this was a fair inference from the evidence. There was no multitude of probabilities here. The submission of proximate cause was sufficient. This situation is in nowise similar to that in Bowman v. Heffron, Mo., 318 S.W.2d 269. The instruction might perhaps have been improved, but we are convinced that it did not misdirect the jury, nor did it mislead it, on these comparatively simple facts. The assertions of error are denied.

Finding no reversible error, the judgment will be affirmed. It is so ordered.

All concur.